# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

UP TO $712,422.30 IN UNITED STATES
CURRENCY IN CHECKING ACCOUNT ENDING IN
9746 HELD IN THE NAME FUZZY THURSTON'S
TICKETS & TOURS, LLC, LOCATED AT M&I BANK/BMO
FINANCIAL GROUP, 770 N. WATER STREET,
MILWAUKEE, WISCONSIN

Case Number: 12-842M (NJ)

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, John Klugewicz, being duly sworn depose and say:

I am a Special Agent assigned to the Federal Bureau of Investigation, and have reason to believe that in the Eastern District of Wisconsin there is now certain property that is subject to forfeiture to the United States, namely up to $712,422.30 in United States Currency in Checking Account Ending in 9746 held in the name Fuzzy Thurston's Tickets & Tours, LLC, located at M&I Bank/BMO Financial Group, 770 N. Water Street, Milwaukee, Wisconsin, which property is forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984, including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), as property that constitutes or is derived from proceeds traceable to wire fraud committed in violation of 18 U.S.C § 1343, and which property is subject to seizure under both 18 U.S.C. § 981(b) and 21 U.S.C. § 853(f).

The application is based on these facts:

✓ Continued on the attached sheet.
❑ Delayed notice of ____ days (give exact ending date if more than 30 days:_____
is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Signature of Affiant
John Klugewicz SA, FBI

Sworn to before me, and subscribed in my presence

March 30, 2012
Date and time issued

at Milwaukee, Wisconsin
City and State

NANCY JOSEPH, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT AND SEIZURE WARRANTS

I, John Klugewicz, having been duly sworn on oath, state as follows:

## Introduction

1. I am employed as a Special Agent with the Federal Bureau of Investigation. I am assigned to the Milwaukee Field Office, Eastern District of Wisconsin. I have been so employed since 1986. My duties as a Special Agent include investigating violations of federal law, including various white-collar crimes such as wire fraud and money laundering. I have received training regarding investigating white-collar crimes, have participated in numerous investigations of white-collar crimes, and have served as the affiant for many applications for search warrants and seizure warrants.

2. The information contained in this affidavit is based on my personal knowledge, information I have received during this investigation from other law enforcement officers, bank security officers, a forensic accountant, and witnesses, all of whom I believe to be truthful and reliable, and from financial records I have obtained during this investigation, which I also believe to be authentic and accurate.

3. I submit this affidavit in support of the following applications for a search warrant and two seizure warrants:

    a. an application for a search warrant for the upper unit and basement of a duplex located at 1131 Glenview Avenue, Wauwatosa, Wisconsin;

    b. an application for a seizure warrant authorizing the seizure of up to $712,422.30 in United States currency from checking account number xxxx9746, held in the name of Fuzzy Thurston's Tickets & Tours LLC, at M&I Bank/BMO Financial Group, 770 N. Water St., Milwaukee, Wisconsin; and

    c. an application for a seizure warrant authorizing the seizure of up to $158,645.10 in United States currency from business money market account number xxxx4595, held in the name of Fuzzy Thurston's Tickets & Tours LLC, at M&I Bank/BMO Financial Group, 770 N. Water St., Milwaukee, Wisconsin.

4. Because I am submitting this affidavit for these limited purposes, I have not included every fact I have learned in this investigation.

## Background

5. IEWC, also known as Industrial Electric Wire & Cable, Inc., is an employee-owned company whose headquarters are located at 5001 S. Towne Drive, New Berlin, Wisconsin. IEWC is an international distributor of wire, cable and wire management products and has warehouses located throughout North America, Europe, and China. It has annual sales of approximately $250 million and approximately 500 employees. During March, IEWC reported to FBI-Milwaukee that it had been defrauded by one of its former employees, Stacy Jenson.

6. From March 2007 through August 5, 2011, Jenson was an employee of IEWC. IEWC initially hired Jenson to serve as a receptionist. Shortly thereafter, Jenson was promoted to the position of event planner in the human resources department. As an event planner, Jenson was responsible for planing events for IEWC employees, customers, and vendors. During her employment with IEWC Jenson was authorized to incur legitimate company expenses on behalf of IEWC but she was not authorized to incur personal expenditures using company funds. On August 5, 2011, IEWC terminated Jenson's employment.

7. From approximately 2008 through the present, including times when Jenson was employed at IEWC, Jenson ran a side business known as Elite Sports & Public Relations, LLC ("Elite Sports"). Elite Sports' website, elitesportsandpr.com, lists Jenson as its president. Elite Sports describes itself as a sports marketing firm that handles event planning services and athlete promotions and where community and charity come first. As described below, Elite Sport's physical address is Stacy Jenson's current residence, the upper unit of a duplex having the address 1131 Glenview Avenue, Wauwatosa, Wisconsin.

8. Jenson hired IEWC employees and spouses of IEWC employees to work, part-time, for Elite. For example, between 2009 and January 2012, Jenson retained Ann V., who had served as IEWC's assistant controller until recently, as a part-time bookkeeper for Elite. Between 2008 and February 2012, Jenson retained Andy R., the husband of Jenson's supervisor, IEWC's human resources officer Erica R., to provide security for Elite and Elite's athlete-clients.

9. On October 19, 1992, Jenson was convicted of felony theft in Milwaukee County Circuit Court and received a sentence of ten years imprisonment, which she served from 1992 through 1996. She was paroled in 1996. In 1992, Jenson was also convicted of misdemeanor issuance of worthless checks in Waukesha County Circuit Court.

10. Fuzzy Thurston Tickets and Tours LLC, doing business as "Titletown Tickets and Tours" and formerly known as "Fuzzy's Tickets and Tours" ("Titletown Tickets"), is a Wisconsin-registered limited liability company. According to the Wisconsin Department of Financial Institutions, its registered agent is William Wenzel and its offices are located at 933 Anderson Drive, Suite J, Green Bay, Wisconsin. According to its website, www.titletowntickets.com, Titletown Tickets is in the business of buying and selling tickets to sporting events and its owner and president is Bill Wenzel. Notably, the logo of Elite Sports and Public Relations appears on the website.

2

## Facts supporting findings of probable cause

11.  For the reasons set forth below, I submit that there exists probable cause to believe that, between approximately March 2007 and March 2012, Stacy Jenson has engaged in a scheme to defraud IEWC and to swindle it out of money, both while she was employed by IEWC and afterwards, by:

   a.  causing IEWC to issue checks to Jenson, whose proceeds she converted to her own use, on the materially false premise and on false express representations that she would use the checks to pay legitimate IEWC expenses or that the checks represented reimbursement for legitimate IEWC expenses that Jenson had already incurred on IEWC's behalf;

   b.  causing IEWC to pay credit card bills for Elite Sports-related charges that Jenson had incurred on an IEWC corporate credit card on the false representation that vendors, used by both IEWC and Elite, had erroneously posted those charges to the IEWC credit card and that Jenson intended to repay IEWC for those charges; and

   c.  causing a ticket broker in Green Bay, with which Jenson did business through Elite, to post over $1 million in unauthorized charges to IEWC credit cards and causing IEWC not to dispute those charges on the false representation that the ticket broker's credit card processor had erroneously posted those bills to IEWC's credit card.

As set forth below, I submit that the scheme involved the use of interstate wire facilities and therefore constitutes wire fraud, in violation of Title 18, United States Code, Section 1343.

12.  Specifically, for reasons set forth below, I submit that Jenson:

   a.  converted to her own use at least $400,000 in proceeds of checks she received by check from IEWC, the proceeds of which she was supposed to use to make deposits and other prepayments to hotels, other venues, and entertainers for IEWC events;

   b.  fraudulently posted approximately $329,241 in credit card charges that she incurred on behalf of Elite Sports to IEWC credit cards by claiming, when confronted about the charges, that vendors had mistakenly posted those charges to the wrong credit card; and

   c.  fraudulently caused Titletown Tickets to post approximately $1,118,227.80 in unauthorized charges to IEWC credit cards and causing IEWC not to dispute those charges on the false representations that the

3

ticket broker's credit card processor had erroneously posted those bills to IEWC's credit card and that she would solve the problem.

13. For the reasons set forth below, I further submit that there exists probable cause to believe that:

  a. evidence, instrumentalities, and fruits of Jenson's wire fraud offense, as described in <u>Attachment B</u> to the search warrant application and proposed search warrant, can be found in the upper unit and basement of a duplex located at 1131 Glenview Avenue, Wauwatosa, Wisconsin;

  b. up to $712,422.30 in United States currency is subject to seizure from checking account number xxxx9746, held in the name of Fuzzy Thurston's Tickets & Tours LLC, at M&I Bank/BMO Financial Group, 770 N. Water St., Milwaukee, Wisconsin; and

  c. up to $158,645.10 in United States currency is subject to seizure from business money market account number xxxx4595, held in the name of Fuzzy Thurston's Tickets & Tours LLC, at M&I Bank/BMO Financial Group, 770 N. Water St., Milwaukee, Wisconsin.

**Jenson's fraudulent conversion of IEWC event-prepayment checks**

14. Between approximately January 2011 and January 2012, Jenson caused IEWC to issue at least $400,000 in checks to her, ostensibly for the purpose of making prepayments for IEWC corporate events, whose proceeds Jenson converted to her own use. Jenson did so on the materially false premise and on false express representations that she would use the checks to incur legitimate IEWC expenses or that the checks represented reimbursement for legitimate IEWC expenses.

15. Between 2009 through 2011, IEWC issued approximately $1.9 million in checks to Jenson and or to cash, according to forensic accountant Ron Bero, who was retained by an attorney for IEWC's Audit Committee of the Board of Directors to investigate the extent of Jenson's suspected misuse of IEWC funds.

16. Bero discovered several instances in which Jenson overstated the amount of prepayments she had made for IEWC corporate events. For example, during 2011, Jenson claimed to be making deposits for a 2012 IEWC summer event at the Grand Geneva Resort in Lake Geneva, Wisconsin. Bero noted that between January 25, 2011, and May 26, 2011, IEWC had issued $97,500 in checks to Jenson that she purported she needed to pay deposits for this event. Bero's investigation revealed that, in fact, no deposits had been made at the Grand Geneva and that IEWC has no reservation for an event there during the summer of 2012.

4

17. Likewise, between September 1, 2009, and April 13, 2010, Jenson claimed to need a total of $217,681 to make prepayments to the Sheraton Hotel in Brookfield, Wisconsin, for event IEWC was to host there in April 2011. In his investigation, Bero found that Sheraton's actual quote for the event totaled only $88,111 and that Jenson had paid Sheraton only $48,500 via her IEWC-issued American Express card or via check. But IEWC issued checks to Jenson for the additional $169,181 that Jenson claimed she needed to pay to Sheraton as a prepayment for the event. Bero opined that, although he has not yet verified the exact amount that Sheraton received as a prepayment for this event, the $217,681 amount that Jenson claimed to have paid is unreasonably high.

18. Current and former IEWC employees indicate that IEWC had initially reimbursed Jenson for expenses she claimed to have incurred on behalf of the company by issuing reimbursement checks payable to either cash or to Jenson. But Jenson failed to provide receipts to support many of these reimbursement requests. So, during February 2010, Jenson and then-IEWC controller David E. and IEWC accounts payable specialist Gloria D. tried to reconcile Jenson's reimbursements up to that time using various records, including Jenson's debit card bank statements. This reconciliation satisfied David E., at that time and given the information then available to him, that Jenson had provided sufficient documentation of her check card debits to account for IEWC corporate checks issued to her.

19. Beginning in February 2010, following that reconciliation, IEWC adopted a new check-request process that required check requestors to provide backup documentation for all check requests.

20. From approximately January 2011 through January 2012, IEWC issued over $400,000 in checks to Jenson based on her requests for checks to make supposed pre-payments for various IEWC-sponsored events. She obtained those checks without the required documentation typically needed to justify IEWC's issuance of a check based on her explanation that she needed the check to make a prepayment for a corporate event and that no invoice was available for such prepayments. Although she routinely promised to provide supporting documentation following the event, Jenson repeatedly failed to do so. To date, Jenson had still provided no documentation to support over $400,000 in IEWC checks she received for prepayments.

21. Both during and after Jenson's IEWC employment, Jenson claimed to have documentation justifying these checks that had been issued to her without such documentation.

22. Beginning in November 2011, about three months after Jenson had been fired by IEWC, IEWC attempted to obtain from Jenson receipts for these undocumented check requests.

23. For example, on or about November 6, 2011, at then-controller David E.'s request, IEWC accounts payable specialist Gloria D. went to Jenson's residence at 1131 Glenview Avenue, Wauwatosa, Wisconsin, to try to obtain those receipts. There, Gloria D. met

5

with Jenson, who produced some receipts from file drawers in an office area of the residence, but those receipts were for earlier time periods, not the period at issue. Jenson then claimed that her current receipts were at a Brookfield residence where she claimed to have lived until recently with her former husband. Jenson then stated that she would meet with her attorney to gain access to the Brookfield house so that she could obtain the records.

24. To date, Jenson has not produced supporting documentation for any of these approximately $400,000 in checks that IEWC had issued to her for event prepayments she claimed she would be making on the company's behalf.

**Jenson's fraudulent use of IEWC credit cards to pay bills for Jenson's Elite Sports business**

25. Between approximately July 2010 and February 2012, Jenson fraudulently caused IEWC to pay over $300,000 in credit card bills for charges that Jenson had incurred for her Elite Sports business using corporate credit cards issued by Chase Bank, ending in the numbers 5311 and 2229, that IEWC entrusted to Jenson.

26. On July 21, 2010, Jenson signed an IEWC document by which she acknowledged that she could not use the IEWC credit card issued to her for personal purchases or cash advances. Jenson further acknowledged that she was to obtain transaction receipts for each card use and that, upon receipt of the monthly bank statement, she was to attach transaction receipts to it and submit the statement and receipts to IEWC's accounting department.

27. According to an analysis performed by forensic accountant Ron Bero, between July 2010 and February 2012, Jenson incurred approximately $2.4 million in credit card charges using the IEWC corporate cards issued to her.

28. According to IEWC, forensic accountant Bero, and Jenson herself, Jenson owes $329,241 for Elite Sports bills wrongly charged to the IEWC corporate credit cards and $16,945 for Elite Sports bills wrongly charged to IEWC's Hertz Rental direct-bill account.

29. Jenson had the opportunity to charge purchases of Elite Sports to IEWC because both entities shared many of the same vendors. For example, both businesses used: Riteway Transportation, Adelman Travel, Jeff's Sports, Hertz Car Rental, MR Z Promotions, and Sheraton Hotels.

30. At least some of these common vendors had separate credit card numbers on file for IEWC and for Jenson's personal business, Elite Sports. Accordingly, when Jenson contacted one of these common vendors to purchase a good or a service, the possibility of confusion as to which business Jenson was representing – her own Elite Sports, or IEWC – was ever-present.

31. IEWC's and Elite Sports' use of at least some of these common vendors also appears deliberate in that, according to Jenson's former supervisor at IEWC, Jenson had recommended some of these vendors to IEWC, and Jenson benefitted from having Elite Sports expenses billed to IEWC.

32. IEWC's review of Jenson's use of its credit card at these vendors from July 2010 to February 2012 showed that charges for the benefit of Elite Sports, which should have been posted to Jenson's Elite Sports company credit card, were instead routinely and incorrectly posted to the IEWC company credit card.

33. When IEWC personnel, such as controller David E., confronted Jenson about these charges that appeared to belong to Elite Sports, Jenson had a stock three-part answer: that the charges were indeed incorrect and belonged to Elite Sports; that the error stemmed from the vendor's mistake of charging an Elite Sports bill to an IEWC credit card; and that Jenson would repay IEWC for these charges.

34. Based on Jenson's representations that these Elite Sports charges had been posted in error, and that Jenson would reimburse IEWC for those charges, IEWC paid these erroneous monthly charges and kept a running total of the IEWC-paid credit card charges for which Jenson was obligated to repay IEWC.

35. Jenson has acknowledged that she owes IEWC approximately $346,000 for Elite Sports bills that had been wrongly charged to IEWC corporate credit cards and to IEWC's Hertz Rental direct-bill account. Specifically, during February 2012, Jenson agreed to issue a check in the amount of $346,000 to IEWC to pay for these bills that IEWC had paid for Elite Sports. To that end, on February 18, 2012, Erica R. met Jenson at Jenson's residence at 1131 Glenview Avenue in Wauwatosa. Jenson then gave Erica R. a check, dated March 16, 2012, in the amount of $346,186.06, drawn on an Elite Sports & Public Relations LLC account. IEWC has not cashed that check because it was post-dated and because Jenson had added a note to the check's memo line reading: "Adelman and Hertz chrgs in full."

36. In view of the number of vendors and length of time over which these Elite Sports charges were made to Jenson's IEWC credit card, I submit that Jenson's claim that these repeated erroneous charges stemmed from vendor errors is implausible and that, instead, the only reasonable conclusion is that Jenson had deliberately and fraudulently caused most, if not substantially all, of these Elite Sports charges to be billed to her IEWC corporate credit cards.

37. For these reasons, I submit that, between July 2010 and February 2012, Jenson fraudulently caused approximately $329,241 in personal expenditures, mostly for her Elite Sports business, to be billed to IEWC corporate cards and also fraudulently caused IEWC to pay those bills based upon her repeated false representations that she would reimburse IEWC for those charges.

7

**Jenson's posting of over $1 million in unauthorized ticket-broker charges to IEWC's credit cards**

38. Between on or about November 30, 2010, and February 14, 2012, after she no longer worked at IEWC, Jenson caused ticket broker Titletown Tickets, which Jenson used in connection with her Elite Sport business, to post approximately $1,118,227.80 in unauthorized charges to IEWC credit cards issued in Jenson's name.

39. Between on or about November 30, 2010, and February 14, 2012, Titletown Tickets posted over 80 charges, totaling approximately $1,118,227.80, to IEWC corporate credit cards issued in Jenson's name, according to an analysis of the records for those cards performed by forensic accountant Ron Bero. Most of those charges were in the amount of $15,000. On some dates, Titletown Tickets posted charges to the IEWC credit card four or five separate times.

40. On prior occasions, IEWC had made some authorized purchases from Titletown Tickets. However, in about October 2011, then-IEWC assistant controller Ann V. noticed unusual charges from Titletown Tickets on the monthly statement of the IEWC corporate card issued to Jenson.

41. Ann V. then contacted Jenson, whose employment with IEWC had come to an end on August 5, 2011, to inquire about the Titletown Ticket charges. Jenson replied that Jenson would find out why those charges were being posted to the IEWC credit card. Soon thereafter, Jenson advised Ann V. that Jenson had spoken with "Bill" of Titletown Tickets and that Bill had stated that Titletown Ticket's credit card processor had billed those charges to IEWC in error. Jenson promised to address the situation on behalf of IEWC.

42. In late November or early December 2011, Ann V. had an unusual telephone conversation with Jenson during which Jenson claimed to be having a simultaneous telephone conversation with a "Bill" from "Word Press," which Jenson described as Titletown's credit card processor. While telling Ann V. that Jenson was trying to get IEWC's erroneous charges reversed, Jenson would break off talking with Ann V. to confidentially talk to "Bill", and then return to Ann V. to assure Ann V. that "Bill" was trying to get the charges reversed. This sequence occurred several times, but as it continued, Titletown charges continued to be posted to, rather than reversed from, the IEWC corporate card.

43. According to Ann V., Jenson caused IEWC to pay and not to dispute those erroneous charges on the false representations that Titletown Ticket's credit card processor had mistakenly posted those bills to IEWC's credit card and that Jenson would work to have those charges reversed.

44. Jenson also caused IEWC to keep the corporate credit card account issued to her open, even after Jenson was no longer working for IEWC, and even to have the credit limit raised, on Jenson's claim that the card had to remain open and the card's credit limit had to be

8

raised sufficiently high to permit Titletown Ticket's credit-card processor to issue the full amount of credit due IEWC.

45. Jenson also caused the interstate wires to be used as a part of her scheme to defraud IEWC. Specifically, between at least September 2011 until February 2012, whenever IEWC paid the credit card balances on the corporate cards issued to Jenson, which balances included fraudulent and unauthorized Titletown Tickets charges, IEWC's payments caused funds to be wired from an FIS processing center in Columbus, Georgia, to Brown Deer, Wisconsin.

46. On February 23, 2012, according to IEWC's CFO Jeffrey S., Bill Wenzel of Titletown Tickets telephoned Jeffrey S. to ask whether "anything illegal was going on" regarding credit card charges that Titletown Ticket had posted to Jenson's IEWC corporate credit card account. Wenzel stated that he had been doing business with Jenson for years and that the charges to the IEWC credit card were the result of a "big misunderstanding."

47. On March 2, 2012, according to Jeffrey S., Wenzel told Jeffrey S. that Wenzel had assumed that the credit card to which Wenzel had made the charges belonged to Jenson. Wenzel further stated that Jenson had been calling Wenzel daily about the transactions and was claiming that she would take care of the situation. Wenzel also stated that he had supporting documentation for all the charges that Titletown Tickets had billed to the IEWC credit card and that he would provide that documentation to IEWC upon written request.

48. On March 3, Jeffrey S. emailed Wenzel to request this documentation. To date, Wenzel has provided no such documentation supporting the over $1.1 million in unauthorized charges that Titletown Tickets had posted to IEWC's credit card between November 30, 2010, and February 14, 2012.

49. I have received and reviewed files from credit card processor FIS, which indicate that, between September 8, 2011, and February 15, 2012, Titletown Tickets posted approximately 50 charges, totaling $712,422.30, to the IEWC card issued to Jenson ending in 2229. Most of these were in the amount of $15,000.

50. In a conversation with me, an FIS investigator stated that FIS believed five large keyed charges that Titletown Tickets had posted to the card ending in 2229 on February 15, 2012, and which totaled $70,000, to be particularly questionable because the football season had already ended by that date.

51. Shortly after February 15, 2012, FIS representatives spoke to "Lynn" in accounting at Titletown, who stated that these February 15 charges were for a repeat business customer, Stacy Jenson of Elite. Lynn told FIS that Jenson had been a customer of Titletown Tickets since 2009, was in good standing, buys tickets in bulk, and has no current or prior issues. Lynn further stated that Jenson was making the charges to pay the remaining balance on the Super Bowl and a cruise.

9

52. Thus, despite Jenson's representations to IEWC that Titletown Ticket's credit card processor had posted these $1,118,227.80 in unauthorized charges to IEWC credit cards in error, according to Titletown Tickets, it was Jenson who had caused these charges to be made – even after she no longer worked at IEWC.

**Evidence of Jenson's wire fraud scheme can be found at 1131 Glenview Avenue, Wauwatosa, Wisconsin**

53. I submit that there exists probable cause to believe that evidence of Jenson's above-described wire fraud scheme is located at the basement and upper-level of a duplex located at 1131 Glenview Avenue, Wauwatosa, Wisconsin, where Jenson resides and where the Elite Sports business is located.

54. On its website, elitesportsandpr.com, Elite Sports lists a post office box in Wauwatosa as its mailing address. According to United States Postal Service records, that box corresponds to the street address, 1131 Glenview Avenue, Wauwatosa, Wisconsin.

55. Reliable witnesses have stated that Elite Sports business records are located in the upper-level unit at 1131 Glenview Avenue, Wauwatosa, Wisconsin, and that merchandise belonging to Elite Sports is located in the basement.

56. For example, Jenson described 1131 Glenview Avenue as the premises as Elite Sports' offices to Erica R., Jenson's former supervisor at IEWC and whose husband Andy R. had worked for Jenson at Elite Sports until February 20, 2012. Moreover, on February 18, 2012, Erica R. met Jenson at this address in an attempt to obtain payment from Jenson for the approximately $346,000 for the Elite Sports bills that Jenson acknowledged had been erroneously charged to the IEWC corporate credit card and to a Hertz Rental direct-bill account.

57. Likewise, Ann V., IEWC's former assistant controller who was also part-time bookkeeper for Elite until January 2012, identified 1131 Glenview Avenue as the premises of Elite Sports. Ann V. has advised me that she had visited those premises in January and February 2012, and that she saw that Jenson keeps Elite Sports records in file cabinets in an upstairs room that also contains computers and desks. Ann V. further stated that Jenson has been using 1131 Glenview Avenue as her residence since January 2012.

58. Ann V. stated that Elite Sports bought sports-related merchandise from Jeff's Sports, and that Jeff's Sports charges appear on the monthly statements of the IEWC corporate card issued to Jenson. Ann V. further stated that, as of January 2012, she had seen sports-related merchandise in the basement at this premises including pictures, shirts, helmets and canvases. Forensic accountant-prepared spreadsheets of Jenson's credit card transactions reflect that Jenson used the IEWC corporate card to make four purchases from Jeff's Sports totaling over $34,000 between December 7, 2010 and July 15, 2011.

59. I have reason to believe that some of the merchandise in the basement might corroborate proof that Jenson had bought merchandise for Elite Sports using IEWC corporate charge cards. For example, Jenson told Ann V. that a $12,000 charge Jenson had made in late 2011 at vendor to MRZ, using an IEWC-issued credit card, was for Christmas calendars but MRZ said this was in fact a charge for Elite Sports-purchased sports clothing.

60. On March 20, 2012, I saw the upper story of a two-story residence at 1131 Glenview Ave., Wauwatosa, WI 53213. A photo I took of the residence is attached to the search warrant application and proposed search warrant as Attachment A. In the driveway of the residence, I saw a 2006 Mercedes Benz E500 4 door sedan, silver aluminum, car bearing Wisconsin Passenger Plate 768MNH, which lists to owner Stacy T. Jenson, born in 1963, 1131 Glenview Ave., Wauwatosa, Wisconsin.

61. I know based on my experience that people maintain business records for tax and business reporting purposes at their home and offices. For this reason, I submit that records and items described in Attachment B to the search warrant application and proposed search warrant – which would include records regarding the actual disposition of, and any supporting documentation for, the prepayments Jenson failed to make with funds that IEWC advanced to her for those deposits; records regarding Elite Sports purchases charged to her IEWC credit cards; merchandise obtained through those purchases; and details of the unauthorized Titletown Ticket charges – are likely located in the upstairs living area and basement of Jenson's Wauwatosa, Wisconsin residence.

**$712,422.30 in proceeds of the scheme are subject to seizure from M&I Bank checking account 9746**

62. Between September 2011 and February 2012, according to my analysis of bank and credit card records and according to persons with whom I spoke at FIS and M&I Bank, approximately $712,422.30 in proceeds of the unauthorized charges that Jenson caused Titletown Tickets to post to Jenson's IEWC credit card were deposited into an M&I Bank checking account, ending in digits 9746, held in the name of Fuzzy's Tickets & Tours LLC. M&I Bank/BMO Financial Group's local offices are located at 770 N. Water St., Milwaukee, Wisconsin.

63. The merchant agreement that Titletown Tickets entered into with its credit card processor, FIS, on or about February 2, 2006, reports: its name as Fuzzy's Tickets & Tours, its gross sales as $1,500,000, its average dollar amount per sale as $600, and its owners as William Wenzel and Fred Thurston.

64. The bank statements for this M&I Bank checking account of Titletown Tickets show that most of the deposits made to this account between September 2011 and February 2012 were derived from the charges that Titletown Tickets posted to the IEWC credit card in Jenson's name.

65. The $712,422.30 in proceeds of the unauthorized charges that Jenson caused Titletown Tickets to post to Jenson's IEWC credit card that were deposited into Titletown Ticket's M&I Bank checking account ending in digits 9746 represent proceeds of Jenson's wire fraud scheme, committed in violation of Title 18, United States Code, Section 1343.

66. Such proceeds traceable to a wire fraud offense are subject to civil forfeiture under Title 18, United States Code, Section 981(a)(1)(C), including cross-references to Title 18, United States Code, Sections 1956(c)(7) and 1961(1), as well as criminal forfeiture under Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

67. Such forfeitable proceeds of a wire fraud offense are subject to seizure via a civil seizure warrant under Title 18, United States Code, Section 981(b)(2) and seizure via a criminal seizure warrant under Title 21, United States Code, Section 853(f), as made applicable by Title 28, United States Code, Section 2461(c).

68. I submit that a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the funds for forfeiture because I have been advised of cases in which, even after restraining order or similar process has been issued to financial institution, the funds sought to be restrained were not effectively restrained by the financial institution. In my judgment, a seizure warrant would be the most effective way to assure the availability of the money sought to seized for forfeiture by the accompanying seizure warrants.

69. Under Title 18, United States Code, Section 984, a court may order the forfeiture of funds in a bank account into which monies subject to forfeiture have been deposited, without the need to trace the funds currently in the account to the specific deposits that are subject to forfeiture, up to the amount of the funds subject to forfeiture that have been deposited into the account within the past one-year period.

70. Section 984 (a) provides in part:

> (1) In any forfeiture action in rem in which the subject property is cash [or] funds deposited in an account in a financial institution -
>
>> (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
>>
>> (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.
>
> (2) Except as provided in subsection (c), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

71. Title 18, United States Code, Section 984(b) provides: "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense."

72. Thus, under Section 984, a court may order the forfeiture of monies found in a bank account into which deposits of criminal proceeds subject to forfeiture had been made, up to the amount of the forfeitable deposits that have been made into the account within the prior one-year period, without the need for tracing the funds to be forfeited to any of the specific forfeitable deposits.

73. Accordingly, I submit that up to $712,422.30 – representing the amount of proceeds of the unauthorized charges that Jenson caused Titletown Tickets to post to Jenson's IEWC credit card that were deposited into Titletown Ticket's M&I Bank checking account, ending in digits 9746 – is subject to forfeiture and seizure from that account.

**$158,645.10 in proceeds of the scheme subject to seizure from M&I Bank money market account 4595**

74. On or about February 21, 2012, according to my analysis of bank and credit card records and according to persons with whom I spoke at FIS and M&I Bank, approximately $158,645.10 directly traceable to those wire-fraud proceeds were then, in turn, transferred from Titletown Ticket's M&I Bank checking account, ending in digits 9746, to an M&I Bank money market account ending in digits 4595, also held in the name of Fuzzy's Tickets & Tours LLC.

75. Records for this account reflect that – using a proceeds-out-last, subject to lowest-intermediate balance tracing method – this February 21, 2012 transfer of $158,645.10 from Titletown Ticket's 9746 checking account to its 4595 money market account was funded entirely by money traceable to the unauthorized and fraudulent charges that Titletown Tickets had made to IEWC's corporate credit card.

76. Accordingly, I submit that, under the forfeiture statutes cited in paragraphs 66 through 72 above, up to $158,645.10 is subject to forfeiture and seizure from Titletown Ticket's M&I Bank money market account ending in digits 4595.

### Conclusion

77. For these reasons, I respectfully request that the Court issue: (a) a search warrant for the upper unit and basement of a duplex located at 1131 Glenview Avenue, Wauwatosa, Wisconsin, (b) a seizure warrant authorizing the seizure of up to $712,422.30 from an M&I Bank business checking account ending in digits 9746, held in the name of Fuzzy Thurston's Tickets & Tours LLC, and (c) a seizure warrant authorizing the seizure of up to $158,645.10 from an M&I Bank business money market account ending in digits 4595, also held in the name of Fuzzy Thurston's Tickets & Tours LLC.

###

13